IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 26, 2019 Session

**STATE OF TENNESSEE v. AMBER NICOLE RAY**

**Appeal from the Criminal Court for Carter County**
**No. 23213     Stacy L. Street, Judge**

_____

**No. E2018-00900-CCA-R3-CD**

_____

The Defendant-Appellant, Amber Nicole Ray, appeals from her Carter County jury convictions of rape of a child and incest, for which she received an effective sentence of twenty-five years' confinement. In this direct appeal, the Defendant argues that (1) the trial court erred in ruling the minor victim's out-of-court recorded statement was admissible hearsay at trial pursuant to Tennessee Code Annotated section 24-7-123; (2) the trial court erred in allowing the State to cross-examine the Defendant regarding the conditions of her home; and (3) the evidence was insufficient to support the convictions. Upon our review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and TIMOTHY L. EASTER, JJ., joined.

Helen "Nikki" Himebaugh, Johnson City, Tennessee, for the Defendant-Appellant, Amber Nicole Ray.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Ken C. Baldwin, District Attorney General; and Janet V. Hardin, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

When he was 7 years old, the victim disclosed to his aunt that the Defendant, his biological mother, had forced him to perform the act of cunnilingus when he was in kindergarten. Following an investigation, the Defendant was charged by presentment with the above offenses. Prior to trial, the Defendant filed a "Motion To Exclude Statements And/Or Objection to State's Notice of Intent To Introduce Video-Taped Statements of Child Victim And Child Witnesses." On March 22, 2017, the trial court conducted a hearing to determine the admissibility of the victim's forensic interview.

Lemy Dao, the Executive Director of the Children's Advocacy Center (CAC) of the First Judicial District, testified extensively concerning the accreditation requirements for the CAC. She also identified the standards for accreditation and a letter confirming the center's accreditation, both of which were admitted as exhibits. She recalled the recorded interview involving the victim, which was conducted by Carey Lewis. She had no independent memory of the interview.

Carey Lewis, a forensic interviewer with the CAC in Johnson City, testified concerning her background and experience as a forensic interviewer. Her curriculum vitae was admitted as an exhibit to the hearing. She testified that Kevin Grindstaff with Department of Children Services (DCS) referred the victim's case to her, which alleged sexual abuse by his biological mother. She conducted the interview of the victim and confirmed that the victim knew he was being recorded at the time. She confirmed that the video accurately recorded her interview of the victim. She identified her report and notes that she took during the interview, both of which were admitted as exhibits. She confirmed that the interview was conducted on March 6, 2015, and her report was completed on March 10, 2015. An anatomical diagram of a boy's body was used during the interview to identify which parts of the body were touched. The victim marked "x" on the parts of the body that were "not okay" to be touched. A blank diagram and a marked diagram were admitted as exhibits. A freehand drawing by the victim made during the interview depicting the victim's "part of the disclosure" was also admitted as an exhibit.

T.K., the victim, testified that he had just turned 10 on March 5, and was in the fourth grade. He knew he was at the hearing to talk about "child abuse" and had previously talked to someone at the CAC about the same. He identified the DVD of his interview taken at the CAC based on his initials and the date. Prior to the hearing, the victim watched the DVD in its entirety while in the district attorney general's office. He confirmed his statements within the DVD were "the truth of what happened to him." The video was made an exhibit to the victim's testimony without objection. The victim further described the exhibit of the freehand drawing showing the Defendant, whom he called his foster mother, making him do "something very bad." He said he was in kindergarten at Southside at the time of the abuse.

On cross-examination, the victim said he was 7 years old at the time he gave the interview, but he did not remember how old he was when he was in kindergarten. Prior to the forensic interview, the victim talked with Karen King, whom he called mom, and his twin sister.

Karen King testified and explained that the victim and his sister were twins, that they had lived with her since the age of 6, and that she had legally adopted them. She

said the Defendant is her deceased husband's niece. She had known the Defendant since birth and said that the Defendant was the victim's biological mother. When the twins were in kindergarten, in 2012 or 2013, the Defendant dropped them off at King's sister-in-law's home so that the Defendant and her boyfriend could get "financially stable." Because King's sister-in-law and her husband were older and unable to take care of small children, King and her husband took care of the children.

King testified that the twins initially shared a bedroom divided by a partition. She said one day she entered the bedroom and the victim's sister jumped off the bed and rolled to the side "almost hiding." She said the victim had a "really guilty look on his face . . . like they'd been caught[.]" This encounter precipitated a discussion about "touches and [how they did not] need to be on the bed together[.]" As they were talking, "out of the blue" the victim asked, "do you know [the Defendant?]" The victim then "just come out and told [King] some things" and his sister began to "chime in" too. Based on this conversation, King contacted a family member who worked at DCS, advised her of the situation, and asked what she should do. A referral was taken by DCS, and King subsequently took the children to the CAC, where the victim's forensic interview was conducted.

On cross-examination, King was asked to recall exactly what the victim told her during the "good touch bad touch" discussion. King replied as follows:

> [The victim] said, do you know [the Defendant] and I said yea[h]. I was - - I looked at him and I said, well, yeah, I know [the Defendant]. And he said, well she did. And I said, she did what. And he said, she used to make me lick her private parts. And I just - - I didn't know what to say I was really stunned. And I didn't really -- I tried not to react. I tried to just let him talk.

In denying the Defendant's motion to exclude the video, the trial court engaged in an extensive analysis and reasoned as follows:

> The court is going to find that, number 1, the video tape is in fact hearsay. The court finds, 2, that there is a specific exception to that hearsay rule as 24-7-123. If the video meets that exception then it is admissible. All right, I'm going to go through those criteria.
>
> . . . .

[The victim] testified today. He testified that he watched the video in [the prosecutor's] office [] when she took the video, or the DVD rather, out of the computer. She put tape in it and had him initial it. While he may be confused as to the building in which it occurred he had no confusion that that, in fact, was the video recording that has been admitted into evidence here today. So, requirement number 1 is met. Number 2, the video recording is shown [] to the reasonable satisfaction of the court in a hearing conducted pre-trial to possess [] particularized guarantees of trustworthiness.

In finding that the video was in fact trustworthy, the trial court meticulously analyzed each factor under Tennessee Code Annotated section 24-7-723. The trial court also determined that the interview was conducted by a certified forensic interviewer who was employed by the CAC. Regarding the Defendant's confrontation clause claim, the trial court acknowledged that the video was admissible conditioned upon the victim testifying at trial.

Prior to trial, the Defendant also moved in limine to exclude any mention of a prior 2013 conviction of attempted child neglect which revealed the substandard conditions of the Defendant's home. Concerning this issue, the prosecutor advised the court as follows:

I can tell the court and I've told [defense counsel] I have no intention of bringing up the facts and circumstances which surround the 2013 basically arrests and plea unless the door is opened. And I submit to the court that in my professional opinion there's a better than great chance that the door will be opened and – because during the course and it's part and parceled is stipulated in that last exhibit. During the timeframe of December of 2012 till the end of January 2013 which encompasses our offense date, during that timeframe the children were interviewed on a much lesser degree, but, nonetheless, they were interviewed by DCE because of the terrible allegations in the home regarding environmental neglect and drug use which [the Defendant] subsequently pled to. During each of those interviews [the victim], in particular, denied anything and[] stated that he felt safe and no one was hurting him. It is my opinion that that may well come in through [defense counsel]. If that is solicited it is my opinion and I submit to the court then the whole picture has to come in.

The trial court granted the motion in limine excluding the testimony, strenuously cautioning both parties, and reasoned as follows:

- 4 -

[T]he court is going to exclude any mention of the prior conviction, unless, it is brought out by the defense and under the rule of completeness it is necessary to go into the facts and circumstances of the prior offense to allow the state to fully explain to the jury what's going on. Now, this is a [] stick of dynamite for both of you . . . how you use it is up to you all. But, [] this prior conviction the facts are bad enough, General, you run the risk of this court stopping you because it's so close in the nature. It's not as bad as what she's accused of now, but it's so close it's sort of like an aggravated assault and assault. It's close enough that this court has to ensure that she's being tried for rape of a child and not because she had a nasty house that she kept her kids in. . . . I won't let you go into how nasty her house was, or how bad it was, or the drugs they were using, whatever. This trial is about rape of a child, so, none of that comes in. [Defense counsel], if you, or one of your witnesses opens that door [] to make that an issue in this trial about [] the number of opportunities that the child had to tell someone about the alleged abuse and didn't, or has some false sense of what safe means if living in a nasty house with drugs all around is safe then you certainly have the right to do that, but you do that with the warning that it could open the door for, at least, some of the facts to come in.

**Trial.** King testified consistently with the testimony provided at the pretrial hearing regarding the forensic interview of the victim. She additionally explained that the twins were her great niece and nephew. They had been initially dropped off at the home of King's elderly mother-in-law, who was unable to care for them. The twins were then taken to the home of her sister-in-law and stayed there for about a week. King testified the twins had lived with her since January of 2013. At that time, she noticed that the victim was a "really bad bed wetter" and had nightmares almost every night. Following counseling, this behavior ceased. She stated that prior to the victim's disclosure of abuse by the Defendant, she had never discussed sex with him. She reiterated that the twins referred to the Defendant, their biological mother, as "Amber," but used the words "Mom" or "Mommy" to describe her.

On cross-examination, King confirmed that she had an older daughter, age 26, who lived with her when the twins initially came to live at her home. She said her daughter eventually got married and moved out. The twins initially shared a room which was divided by a partition for about a year. Following the victim's disclosure, she created a room for the victim's sister in her dining room. She said the victim was initially "always kind of quiet" but now "he will talk[] your ear off." King also confirmed that the victim stayed "off and on" with his grandmother, the Defendant's mother, whom he referred to as "Mamaw Becky." On re-direct examination, King characterized the victim's relationship with his grandmother as follows:

[The victim] worships her.  He . . . I have never heard [the victim] speak an ill word about [his grandmother].  He's very – very, very fond of her.  He has good memories of her.  I've just never heard him speak ill of her at all.

On March 6, 2015, Sergeant Chris Bowers of the Elizabethton Police Department began investigating the referral pertaining to the victim in this case.  Sergeant Bowers testified at trial and established the time frame for the offense.  Between August 2012 and January 2013, the Defendant, her boyfriend, and the twins lived at 657 Jena Beth Drive, Apartment 3, in Elizabethton, Tennessee.  He confirmed this information with the mother of the Defendant's boyfriend and by an electricity work order form, which was admitted as an exhibit.  The twins' school enrollment records also showed the same address for the Defendant and her boyfriend, who were their guardians at that time.  Sergeant Bowers interviewed the Defendant, who also confirmed the Jena Beth address for that time frame.  During the interview, the Defendant told him that she did not speak with the twins about sex.  The Defendant also said she did not believe in "porn," and she was reluctant to have sex with her boyfriend while the twins were in the house.

On cross-examination, Sergeant Bowers confirmed that the case was referred to him from Kevin Grindstaff with DCS.  He said he spoke with the Defendant, in person, almost a month after he officially received the case.  He acknowledged that the Defendant denied the allegations and theorized that her mother may have been the perpetrator.

The victim's sister, age 10 at the time of trial, confirmed that the victim was in fact her twin brother and that the Defendant was her biological mother, whom they referred to as "Amber."  She recalled attending kindergarten at West Side school in Carter County.  During that time, she lived in an apartment along with her brother, the Defendant, and the Defendant's boyfriend.  On occasion, the victim's sister observed the Defendant take the victim into the bedroom and shut the door.  The victim's sister said she went to the door to listen and heard "huffing and puffing."  She also heard the Defendant say, "You're so sexy."  The victim's sister testified that when the Defendant and the victim came out of the room, their hair was "messed up."

The victim, age 10 at the time of trial, testified that he lived with the Defendant when he attended kindergarten.  The victim's forensic interview was admitted into evidence and played for the jury.  At the beginning of the 36-minute interview, Carey Lewis and the victim enter the room at the CAC.  Lewis explains her role in the process, tells the victim he is being recorded, and confirms that the victim knows the importance of telling the truth in the room.  The victim said he was 8 years old, had just had a birthday, and enjoyed watching television.  He explained that he was "born to Amber," had lived with Mamaw Becky, Amber, and his other grandparents, but he currently lived

with Karen. Asked what it was like living with "Mommy Amber," the victim wrote "sex" on the easel flipchart. Asked what that term meant to him, the victim said, "Nasty. Amber, she made me lick her . . . ." The victim then wrote "private part" on the easel flipchart. He continued and said, "I was sleeping and she would wake me up pull me out of room and make me lick her private part and I don't want to." The victim said that it happened more than once, with the last time occurring when he was in kindergarten.

During the interview, the victim was shown anatomically correct diagrams of a boy and girl upon which he identified what he knew to be private parts. He repeatedly told the interviewer that the Defendant made him "lick the inside of her private parts" with his tongue, which was "nasty." He said the Defendant made a noise when he was forced to do it, but he could not make the same sound. The victim physically described how he would be on his knees on the floor at the end of the bed while the victim was on her back on the bed. He formed his fingers in the shape of a "V" to illustrate how the Defendant's legs were positioned.

The victim was asked to draw a picture of the room and how they were positioned, and he did so. The freehand drawing showed a bed with the head of a figure the victim identified as "Amber" closest to the headboard, lying on her back, appearing to smile, with the sound "a a a" coming from her mouth. The body of the same figure has a "V" shape at the end, which the victim identified as her private part. Within the opening of the "V" is another figure, identified by the victim as himself, at the end of the bed closest to the door.

The victim confirmed at trial that the statements he provided in the recorded interview were true. He said that when the abuse occurred, "Mamaw Becky" did not live with them. Each drawing that the victim identified during the forensic interview was admitted into evidence.

Carey Lewis, the certified forensic interviewer who conducted the interview of the victim, and Kevin Grindstaff, the DCS worker, testified on behalf of the Defendant. Lewis generally recalled interviewing the twins in this case. She had not reviewed the video recording of their interviews and was unable to remember any specifics. Grindstaff confirmed his familiarity with the instant case. He initially met with the twins in private sessions which eventually progressed into family counseling.

The Defendant testified that she lived most of her life with her grandparents, and she did not remember living with her mother. At age 15, she became pregnant with the twins, whose father died before they were born. Her grandparents helped her with the twins, and she received various forms of government assistance. She had another child sometime later, who was younger than the twins. When the Defendant spoke with the

authorities regarding the victim's disclosure, she told them that he had previously lived with her mother and spent most of his time with her. She denied the allegations and explained that the victim lived with her mother from six months of age "all the way up until right before he started kindergarten." The Defendant said the victim called her mother, "Mommy," and she was unsure if it was because he wanted to call her that or her mother had him call her that. She turned herself in to the police upon seeing the warrant for her arrest on the news.

Asked if she was trying to make the "very best home that [she] could make for [the twins]," the Defendant replied:

> I did try. Yes. I might not be the very best mother that there is and I do have my fall-downs. I might not be the cleanest person in the world, and I do certainly have problems cleaning, and it didn't do the best that I could have. But I was trying.

The State then asked to approach the bench and argued that the defense had opened the door to the underlying facts of the prior conviction. Defense counsel argued that the Defendant was responding to direct examination and had not opened the door. The trial court agreed that the Defendant had opened the door; however, it limited the inquiry on cross-examination to the Defendant's housekeeping skills and not the prior conviction. After the Defendant confirmed that law enforcement came to her home on Jena Beth Drive in December 2012, the following exchange occurred:

> STATE: Do you recall that there were roaches crawling all over the place: on the wall, in the floors, in the sink, on the bedding, and inside the refrigerator?
>
> DEFENDANT: There were. Yes, I do. But there were . . . It was an apartment complex and everybody there, the whole building had it. It was a problem. And we had been trying to get rid of it. Our – his uncle had went and bought everything that we could to try to get rid of them, but it's very hard to do that when you have so many other apartments around you and nobody else is doing anything to get rid of anything.
>
> STATE: Okay. And do you recall that there was trash throughout the apartment, stacked up on the wall, ashtrays overflowing with used cigarettes? The children's bed was soiled black with no bed linen. Dishes stacked in the sink and all over the counter. And the officers felt that that was a very serious condition that they had to talk to you about. Do you remember that?

DEFENDANT: They did talk to me. Yes, I remember them talking to me. But the beds did have linens and things, they had just been taken off to be washed. The bed had stains on it from where [the victim] would wet the bed constantly when I first got him. He would also wet the floor anywhere. When I first got him from my mother, he was like that.

The State continued to press the Defendant regarding the conditions of her home and asked if she had to be evicted. The Defendant began to answer, but the trial court interrupted her and provided the jury with an extensive curative instruction explaining that the testimony concerning the Defendant's housekeeping skills was to be considered solely for the purpose of determining the Defendant's credibility.

Based on the above proof, the jury convicted the Defendant as charged of rape of a child and incest. The trial court imposed concurrent terms of imprisonment of twenty-five and three-years, for an effective sentence of twenty-five years. Following an unsuccessful motion for new trial, the Defendant filed a notice of appeal. She is now properly before this court.

## ANALYSIS

**I. Admissibility of Recorded Interview of Minor Victim**. The Defendant's issue presented is whether the trial court erred in ruling the minor child's out-of-court recorded statement was admissible hearsay at trial pursuant to Tennessee Code Annotated section 24-7-123. She does not challenge any of the statutorily required findings made by the trial court in support of its decision to admit the video. Instead, the Defendant argues broadly that the admission of the video of the victim's forensic interview violated the Confrontation Clause. As we understand her claim, she specifically argues that the video of the forensic interview was "unreliable" hearsay due to the passage of time between when the abuse occurred, when it was disclosed, and the recording of the forensic interview. She acknowledges that the same challenge to section 24-7-123 was raised and rejected in State v. McCoy, 459 S.W.3d 1, 16 (Tenn. 2014) (holding that "notwithstanding the testimonial nature of video-recorded statements taken pursuant to Tennessee Code Annotated section 24-7-123, the admission of these statements does not violate a defendant's right of confrontation so long as the child witness authenticates the video recording and appears for cross-examination at trial, as required by our statute"). Nevertheless, she expresses her disagreement with the holding in McCoy.

The Tennessee Supreme Court, by which we are bound, resolved this issue in McCoy. The record shows that prior to trial, the trial court fully complied with the requirements of Tennessee Code Annotated section 24-7-123. The victim subsequently testified at trial and confirmed that the statements he provided in the video of the forensic

interview were true. Accordingly, the trial court properly admitted the video of the forensic interview, and the Defendant is not entitled to relief.

**II. Cross-Examination.** The Defendant next argues that the trial court erred in allowing the State to cross-examine her regarding the conditions of her home. She claims that this proof effectively bolstered the State's case and prejudiced the jury. In response, the State contends that this issue has been waived because "[t]he Defendant's single-sentence assertion that the trial court erred when it let the State cross-examine her about the conditions of her home is insufficient to preserve appellate review of this issue." Here, we are compelled to agree with the State. A brief shall contain "[an] argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on." Tenn. R. App. P. 27(a)(7). Failure to comply with this basic rule will ordinarily constitute a waiver of the issue. Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); State v. Thompson, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000) (determining that issue was waived when defendant cited no authority to support his argument on appeal). The Defendant does not support this issue with any argument or authority; consequently, it is waived. The Defendant is not entitled to relief on this issue.

**III. Sufficiency of the Evidence.** The Defendant argues that but for the admission of the victim's recorded statement, the State failed to produce reliable forensic evidence. In support of this issue, the Defendant relies upon the trial court's concerns during the pre-trial hearing regarding the passage of time between the allegations of abuse and the disclosure of the statement. The State contends the evidence was sufficient to support the Defendant's convictions of rape of a child and incest. We agree with the State.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be

drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

The Defendant was charged with and convicted of rape of a child and incest. In order to sustain a conviction of rape of a child, the State was required to prove beyond a reasonable doubt that (1) the Defendant unlawfully sexually penetrated the victim, (2) who was less than thirteen years old, and that (3) the Defendant acted intentionally, knowingly, or recklessly. Tenn. Code Ann. § 39-13-522. Sexual penetration is defined, in relevant part, as "sexual intercourse, cunnilingus, [or] fellatio." Tenn. Code Ann. § 39-13-501(7). Incest, as relevant here, is established by proving beyond a reasonable doubt that the Defendant engaged in sexual penetration as previously defined in section 39-13-501, with the victim, knowing the victim to be, without regard to legitimacy . . . the defendant's natural child. Tenn. Code Ann. § 39-15-302.

Taken in the light most favorable to the State, the proof at trial established that the victim lived with the Defendant, his biological mother, for a short period of time while he was in kindergarten. The victim and his twin sister were moved from family member to family member because the Defendant was unable to care for them on her own. At age 6, the victim moved in with his aunt and became stable. A year later, during a discussion about good touches and bad touches, he disclosed to his aunt that the Defendant had forced him to lick her private parts. King reported the abuse to the authorities, and the victim was interviewed by Carey Lewis, a certified forensic interviewer. During the recorded interview, played for the jury at trial, the victim again disclosed that the

- 11 -

Defendant had forced him to lick her private parts. He said that the last time it occurred was when he was in kindergarten. The victim said that the Defendant made him lick the inside of her private part with his tongue, that it was nasty, and that he did not want to do it. The victim provided explicit details about the room they were in and how he was positioned between the Defendant's legs. In the recording, the victim kneels down at the end of a table and demonstrates how the abuse occurred. The victim confirmed at trial that the statements he provided in the recorded interview were true. The victim's twin sister also testified that the Defendant would take the victim into a room and shut the door. She said that she would get up close to the door to listen and heard unusual noises. She also heard the Defendant say, "You're sexy," while they were in the room. The victim's sister also observed the Defendant's hair was "messed up" when she eventually came out of the room. Based on this evidence, a reasonable jury could conclude that the Defendant committed rape of a child and incest. She is not entitled to relief.

## CONCLUSION

Based on the above reasoning and analysis, the judgments of the trial court are affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE

- 12 -